## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

JONATHAN RICHARDSON a.k.a.
AUTUMN CORDELLIONE,

     *Plaintiff*,

     v.

COMMISSIONER, INDIANA
DEPARTMENT OF CORRECTION, in her
official capacity,

     *Defendant*,

     v.

WORLD PROFESSIONAL ASSOCIATION
FOR TRANSGENDER HEALTH,

     v.

     *Third-Party Subpoena Recipient*.

Case No.

## MOTION OF NONPARTY WORLD PROFESSIONAL
## ASSOCIATION FOR TRANSGENDER HEALTH TO QUASH SUBPOENA

### I.    INTRODUCTION

Illinois' recently enacted "Shield Law," known as the Lawful Healthcare Activity Act ("LHCA Act"), bars the subpoena at issue here (the "Subpoena"). The Shield Law protects medical professionals in Illinois from out-of-state subpoenas, just like this one, related to the professionals' lawful healthcare activity. The Subpoena—which is issued from the Indiana Republican State Attorney General (the "State")—is sadly the latest attempt by Republican Attorneys General to attack groups that support trans

people.[1] The Shield Law requires quashing the Subpoena in its entirety. Moreover, black-letter constitutional principles prohibit subpoenas like this one that so transparently attempt to chill free speech and free association for a politically-disfavored group.

The World Professional Association for Transgender Health ("WPATH") is an Illinois non-profit organization dedicated to promoting evidence-based care, education, research, public policy, and respect in transgender health. Unfortunately, WPATH's efforts are under attack because politicians like the Republican State Attorneys Generals ("AGs") misconstrue and mischaracterize what groups like WPATH do. To date, nearly half a dozen AGs have lodged and initiated overbroad, irrelevant, and unlawful third-party subpoenas and litigation against WPATH over the past several months. The nonparty subpoenas have collectively sought hundreds of categories of documents from WPATH, and contrary to the AGs arguments, the subpoenas are unrelated to each underlying litigation in which the AGs are defending their individual state's ban or limit on transgender healthcare. In fact, one court most recently described the third-party litigation brought by the AGs as "nonsensical."[2] And another court has already determined that the Shield Law bars substantially similar, and in some cases, the very information that the State seeks in its Subpoena.[3]

---

[1] WPATH recently filed a motion to quash in this court seeking to quash yet another subpoena which was issued by a Republican State Attorney General—the Attorney General from the State of Idaho. *See* Case No. 24-12051. Both the Idaho subpoena and the instant subpoena concerned substantially the same subject matter—WPATH's efforts to aid those with gender dysphoria through evidence-based care, education, and research. Coincidentally, the subpoenas were issued about two weeks apart. Moreover, WPATH's arguments in support of its position that the subpoenas should be not enforced are substantial. Pursuant to Rule 42 of the Federal Rules of Civil Procedure, and in light of the fact that both of WPATH's motions to quash raise the same legal arguments, and involve common questions of fact and law, WPATH requests that both motions be consolidation into one action.

[2] *See* Exhibit A, Granting Order to Dismiss Third-Party Complaint, *Kalarchik, et al., v. State of Montana, et al.,* C.A. ADV-2024-261 (Mont. First Jud. Dist. Ct., Lewis and Clark Cty., Oct. 30, 2024).

[3] *See* Exhibit B, Granting Motion to Quash, *Noe, et al., v. Parson, et al.,* C.A. 2024-MR-3 (Cir. Ct. Kane County, Ill., Sept. 27, 2024).

DCACTIVE-78427692.4

The Shield Law and constitutional law render the Subpoena unenforceable before even reaching the basic civil procedure rules governing third-party subpoenas, which require a subpoena, like this one, to be quashed when it is overbroad, or when it imposes a disproportionate burden.

## II.    BACKGROUND

### A.    The Underlying Litigation

On August 28, 2023, a transgender inmate within the Indiana Department of Correction ("DOC") sued the Commissioner of the DOC to challenge Indiana Code § 11-10-3-3.5(a), which prohibits the provision or facilitation of "sexual reassignment surgery," also known as gender-affirming surgery, for prisoners. Plaintiff challenges the statute as a violation of the Eighth Amendment by mandating deliberate indifference to serious medical need, and as discriminatory towards transgender prisoners in violation of the Equal Protection Clause of the Fourteenth Amendment. The suit seeks, among other things, injunctive and declaratory relief for Plaintiff to receive gender-affirming care. *See Jonathan Richardson, a.k.a. Autumn Cordellione v. Commissioner, Indiana Department of Correction*, C.A. No. 3:23-cv-135 (S.D. Ind.) (hereafter "Underlying Litigation").

### B.    Nonparty WPATH

The World Professional Association for Transgender Health is a nonparty to the Underlying Litigation and the subject of the State's out-of-state Subpoena. Founded in 1979, WPATH is a 501(c)(3) non-profit professional and educational organization that has been devoted to transgender health for decades. *See* Declaration of WPATH ("WPATH Decl.") ¶ 5. WPATH's mission is to promote evidence-based care, education, research, public policy and respect in transgender health. *Id*. at ¶ 7. WPATH is an international membership organization, with regional affiliate organizations in Europe and the United States. *Id*. at ¶ 9. WPATH is internationally recognized as a leader in research and treatment for individuals with gender dysphoria. *Id*. at ¶ 8.

### C.    The Subpoena

DCACTIVE-78427692.4

On September 25, 2024, the State served the instant out-of-state Subpoena on WPATH. *See* Exhibit C. The Subpoena contains fourteen requests for documents and information from WPATH. The Subpoena seeks, among other things, all communications and documents relating to WPATH's research and drafting of dozens of publications; communications relating to internal matters within WPATH and WPATH correspondence with any governmental entities, correctional facilities, and medical contractors; information about WPATH's activities and academic scholarship on gender-affirming care; and all communications and documents pertaining to four different unrelated lawsuits in which WPATH was also subpoenaed as a third-party.

### D. Meet-and-Confer Efforts

WPATH retained counsel in this matter on October 9, 2024. *See* Declaration of Derick D. Dailey ("Dailey Decl."), ¶ 5. Since that time, counsel has engaged in good faith negotiations with the Indiana Attorney General. *Id*. at 4. During its initial discussions with the State, WPATH explained that it was reviewing the Subpoena and that the Subpoena's requests were likely barred by the Shield Law. *Id*. at 5. WPATH also requested a thirty-day extension to further review the Subpoena and to provide its responses and objections to the Subpoena, making its Responses and Objections ("R&Os") due on November 25. *Id*. at 6. The State granted WPATH's request. *Id*. During this same time, WPATH agreed to provide documents to the State that were responsive to the Subpoena that have been produced and unsealed in prior litigation on a rolling basis and within the thirty-day extension period. *Id*. at 7.

On November 25, WPATH provided the State R&Os. *Id*. at 8. WPATH's R&Os explained that the Shield Law provided a wholesale bar to the Subpoena. *Id*. It further explained that many of the Subpoena's requests are barred by the First Amendment's Speech and Associational privileges. *Id*. In a call on November 27, WPATH explained to the State that it did not provide any documents in response to the Subpoena because of the Shield Law and also explained that since its initial discussions with the State and agreeing to provide the State with responsive and unsealed documents on a rolling basis, a state court

4

judge in Montana dismissed a third-party action against WPATH wherein WPATH argued, among other things, that the lawsuit infringed upon WPATH's First Amendment rights. *Id*. at 9. WPATH further explained that an Illinois state court had recently ruled that the Shield Law barred disclosure of substantially-similar documents sought in a subpoena from the Missouri Attorney General. *Id*.

In response to WPATH, the State asked if WPATH would be producing documents in response to the Subpoena. WPATH responded by saying that it was continuing to review the Subpoena and the relevant law and that it relies on its R&Os. *Id*. at 10. Thus, the parties' good faith discussions were unable to resolve the parties' disagreements, resulting in the instant Motion to Quash (the "Motion").

## III.  ARGUMENT

### A.  This Motion Belongs in this Court.

This Subpoena was issued from the Southern District of Indiana. However, since WPATH is a nonparty located within the Northern District of Illinois, this Motion is properly filed here.  Federal Rule 45(d)(3)(A) states that "the court for the district where compliance is required" is the appropriate venue for filing a motion to quash. For purposes of a motion to quash, the place of compliance is where the subpoenaed party is located. *See Raap v. Brier & Thorn, Inc*., 2017 U.S. Dist. LEXIS 87004 (C.D. Ill. Jun. 7, 2017) (granting motion to quash and explaining that due to the purpose behind Rule 45, the place of compliance should be tied "to the location of the subpoenaed person or entity"); *see also York Holding, Ltd. V. Waid*, 345 F.R.D. 626 at *9 (Apr. 3, 2024) (explaining that "the place of compliance for the purposes of filing a motion to quash a subpoena seeking documents from a nonparty is the place where that nonparty is located"). This Court is therefore the appropriate court to decide this Motion.

### B.  Illinois' Shield Law Renders the Subpoena Unenforceable.

Subpoenas issued pursuant to Rule 45 permit a court to quash a subpoena for various reasons and the court is required to quash or modify a subpoena when it requires disclosure of privileged or other *protected matter*, when no exception or waiver applies. *See* Fed. R. Civ. P. 45(d)(3)(A)-(B); Fed. R. Civ.

5

P. 45(d)(3)(A)(iii) (emphasis added). Federal courts recognize that "privacy interests and confidentiality concerns can factor into a decision whether to quash a subpoena under Rule 45, even though the information requested by the subpoena is not subject to a federal evidentiary privilege." *Jordan v. Comm'r, Mississippi Dep't of Corr.*, 947 F.3d 1322, 1336 (11th Cir. 2020) (opining that when a citizen is assured a protection via state statute, this promise should not be discarded lightly).

The Shield Law provides that a subpoena requesting documents or information related to lawful healthcare activity, as defined in the Lawful Healthcare Activity Act ("LHCA Act"), is unenforceable unless an exemption applies.[4] *See* 735 ILCS 35/3.5(a). The State, with no notable exemption, seeks documents and information relating to WPATH's lawful healthcare activity. WPATH respectfully requests that the court quash this Subpoena, as the requests seek disclosure of "other protected matter." *See* Fed. R. Civ. P. 45(d)(3)(A)(iii).

> **1.** **The Subpoena seeks documents and information related to lawful healthcare activity.**

The Subpoena's grossly overbroad requests fall squarely into the definition of "lawful healthcare activity" under the LHCA Act, which is defined as:

> the treatment of gender dysphoria or the affirmation of an individual's gender identity or gender expression, including, but not limited to, all supplies, care, and services of a medical, behavioral health, mental health, surgical, psychiatric, therapeutic, diagnostic, preventative, rehabilitative, or supportive nature that is not unlawful under the laws of this State, including on any theory of vicarious, joint, several, or conspiracy liability.

---

[4] 735 ILCS 35/3.5 states that a clerk of court shall issue a subpoena that requests information related to lawful health care activity if the subpoena relates to 1) an out-of-state action founded in tort, contract, or statute brought by the patient who has sought or received lawful health care or the patient's authorized legal representative for damages suffered by the patient or derived from loss of consortium of the patient, or 2) an out-of-state action founded in contract brought or sought to be enforced by a party with a contractual relationship with the individual whose documents or information are the subject of the subpoena. Neither of these exemptions apply in the Underlying Litigation.

DCACTIVE-78427692.4

*See* 735 ILCS 40/28-10. The LHCA Act further defines "lawful health care activity" to mean "seeking, providing, receiving, assisting in seeking, providing, or receiving, providing material support for, or traveling to obtain lawful health care." *Id*. .

The State seeks documents and information about WPATH's lawful healthcare activity. In its Subpoena, the State has demanded discovery into WPATH's lawful healthcare activity that can be grouped into the following categories: (1) requests relating to the Standards of Care for gender-affirming medical care that WPATH helps facilitate; (2) requests relating to information that WPATH relied on for its Standards of Care for people in correctional facilities; (3) requests relating to information produced by WPATH members that relate to WPATH's Standards of Care; (4) requests relating to information that WPATH has produced in other litigation; and (5) requests relating to WPATH's communications with local, state, and federal governments involving gender dysphoria. *See* Exhibit C.

This Subpoena clearly seeks documents and information related to WPATH's lawful healthcare activity since it seeks documents regarding the treatment of gender dysphoria. WPATH, a professional association that sets the standard of care for gender-affirming medical care, engages in lawful healthcare activity by "providing," "assisting in . . . providing," and "providing material support" for the treatment of gender dysphoria and gender affirming care by issuing clinical guidelines on the widely-accepted standard of care for gender dysphoria. *See* 735 ILCS 40/28-10; *see also* WPATH Decl. ¶¶ 7–8. The Subpoena thus requests information that is protected under the Shield Law.

### 2. Illinois Enacted Its Shield Law to Bar Subpoenas Just Like This One.

In overruling decades of abortion-rights jurisprudence, including the right to an abortion, in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), the Court also made clear that the power to regulate any aspect of reproductive healthcare not protected by federal law would be left to individual states. *Id*. In response to the Court's decision, nearly two dozen states took steps to protect the right and access to reproductive healthcare.

7

Illinois enacted sweeping new reproductive rights and gender-affirming care protections (HB 4664)—a bill that "protects health care providers and their patients from legal attacks by neighboring states and expands health care access and options across the state."[5] As Governor Pritzker noted when he signed the bill into law, the new law would "protect[] Illinois providers and their patients, thousands of whom have travelled to Illinois to access essential reproductive health care now banned in their home states." *Id*. The Governor's office explained that "many providers fear legal action from reactionary state governments from providing essential care," and that, in response, the law would "shield[] individuals from civil and criminal discovery from other states[.]" *Id*.

The Shield Law was created for this exact situation: to protect WPATH from "legal action from reactionary state governments." *Id*. Through the Subpoena, the State seeks information regarding lawful healthcare activity from WPATH, an Illinois nonprofit organization. Both the letter and the spirit of Illinois' Shield Law is to prevent states from targeting groups like WPATH with subpoenas like the one that has been served here. An Illinois court recently agreed that the Shield Law protects WPATH from reactionary governments by granting WPATH's motion to quash a subpoena in a separate case. *See* attached as Exhibit B, Court Order in *Noe, et. al., v. Parson, et. al.*, Case No. 2024-MR-3 (Kane Cty., Illinois). The Subpoena here seeks much of what was quashed in the aforementioned subpoena. Like the Illinois state court concluded, this Court too should conclude that the Shield Law requires quashing of the Subpoena because it seeks lawful healthcare activity from WPATH.

### C. Enforcement of the Subpoena Would Infringe WPATH's First Amendment Speech and Associational Rights.

This Court also should quash the Subpoena because it infringes on WPATH's First Amendment Speech and Associational rights. If WPATH were required to produce documents in response to this

---

[5] *See* Press Release, Gov. Pritzker Signs Sweeping Reproductive Rights Protections Into Law (Jan. 13, 2023), *available at* https://www.illinois.gov/news/press-release.25906.html, (last visited Nov. 19, 2024).

Subpoena, there would be a chilling effect on the internal exchange of ideas among WPATH members, stakeholders, and supporters. WPATH Decl. ¶¶ 9–14. Additionally, individuals such as medical, healthcare, and academic professionals would be discouraged from participating in WPATH activities and events, such as learning symposia, academic conferences, research surveys, book projects, and WPATH meetings. *Id.* Such disclosure of information would adversely impact WPATH's mission of furthering the understanding and treatment of gender dysphoria by providing opportunities for professionals from various sub-specialties to discuss research and treatment. Disclosure would impede WPATH and its members from engaging freely with one another without fear of reprisal or fear that their engagement may become the subject of public scrutiny from reactionary state governments with a history of targeting the trans community. *Id.*

Courts routinely quash subpoenas that infringe on protected speech and associational interests. *See, e.g.*, *City of Greenville v. Syngenta Crop Prot., Inc.*, No. 11-MC-10, 2011 WL 5118601, at *7–10 (C.D. Ill. Oct. 27, 2011) (quashing nonparty subpoenas that sought internal communications between the Association and a member on First Amendment associational privilege grounds because disclosure would chill organizational activity); *AFL-CIO v. FEC*, 333 F.3d 168, 176–78 (D.C. Cir. 2003) (applying First Amendment privilege where compelled disclosure of "detailed descriptions of training programs … seriously interferes with internal group operations and effectiveness"); *Apple Inc. v. Match Grp., Inc.*, No. 21-MC-80184-YGR (TSH), 2021 WL 3727067, at *8–9 (N.D. Cal. Aug. 19, 2021) (granting motion to quash requests for organization's internal documents on First Amendment grounds and explaining that individuals would not want to participate in organizations if they knew their internal communications would be turned over).

DCACTIVE-78427692.4

The First Amendment has historically provided broad protections for free rights of association. *See NAACP v. State of Ala. Ex rel. Patterson*, 357 U.S. 449, 460–63 (1958). The District Court for the Central District of Illinois opined that:

> The right of association is a basic constitutional freedom, that is closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society. In view of the fundamental nature of the right to associate, governmental action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny.

*See City of Greenville,* 2011 WL 5118601, at *5.

Under the First Amendment's associational privilege, organizations are protected from compelled disclosure that would "induce members to withdraw … and dissuade others from joining it because of fear of exposure[.]" *NAACP*, 357 U.S. at 463. Importantly, "[t]he First Amendment associational privilege emerges when a discovery request specifically asks for a list of a group's anonymous members, or requests any similar information that goes to the heart of an organization's associational activities, and such disclosure could arguably infringe upon associational rights." *See Anderson v. Hale*, No. 00 C 2021, 2001 WL 503045, at *3 (N.D. Ill. May 10, 2001) (granting a motion to quash as to information on anonymous internet account users to protect their right to remain anonymous) (citing *Adolph Coors Co. v. Movement Against Racism & the Klan*, 777 F.2d 1538, 1542 (11th Cir. 1985)). Moreover, the associational privilege extends to "the content of internal communications between members, employees, and agents of associations." *City of Greenville*, 2011 WL 5118601, at *6 (citing *Perry v. Schwarzenegger*, 591 F.3d 1147, 1162-63 (9th Cir. 2010)). "Sometimes disclosure of the identity of the members of the association will subject members to harassment and intimidation because the association advocates a controversial view." *Id.* (citing *NAACP*, 357 U.S. at 462). Simply put, the associational privilege applies if the disclosure would "affect adversely" the "members' [ability] to pursue their collective effort to foster beliefs" by either "induc[ing] members to withdraw from the [organization]" or "dissuad[ing] others from joining it." *NAACP*, 357 U.S. at 462–63.

10

A *prima facie* showing of First Amendment infringement requires the party to demonstrate that enforcement of the discovery requests will result in "(1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights." *City of Greenville,* 2011 WL 5118601, at *6 (*citing Perry*, 591 F.3d at 1160). Importantly, requests for confidential information about an organization's members have been barred under the First Amendment. *See In re Heartland Inst.*, No. 11 C 2240, 2011 WL 1839482, at *5 (N.D. Ill. May 13, 2011) (granting a motion to quash a third-party subpoena for confidential donor information because the subpoena infringed on the First Amendment rights of the third party with a chilling effect).

Here, the State seeks information from WPATH about its research, members, stakeholders, and others that is clearly protected by the First Amendment's associational privilege. *See* Ex. C, Request Nos. 2–5; 10–14. The release of this information to the public would have a chilling effect on the individuals and institutions that take part in the important work that WPATH does. The attached declaration from WPATH explains in detail how disclosure of the information sought by the State would chill the organization's associational rights. *See* WPATH Decl. ¶¶ 9–14. As the WPATH Declaration makes clear, and in light of an uptick in harsh rhetoric and political attacks lodged at the transgender community, WPATH's mission and work can easily be considered controversial. Importantly, "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *See Perry*, 591 F.3d at 1159.

The State seeks communications that identify how members, nonmembers, professionals, and nonprofessionals participate in WPATH meetings, committees "relating to its work on the SOC-8 revisions" and "its review of and any revisions made to pertinent sections of SOC-7." *See* Ex. C, Request Nos. 2–5. The Subpoena also seeks all communications and documents from WPATH members relating

to "the Applicability of the Standards of Care to People Living in Institutional Environments working group." *Id*. at 10. Additionally, the Subpoena seeks to compel the disclosure of all communications between WPATH and other medical and professional organizations about gender dysphoria, all communications between WPATH and federal, state, and local government officials, and all communications relating to WPATH adoption of certain Standard of Care Recommendations (Nos. 2–14). Compelled disclosure of any of the above information would significantly chill WPATH's activities. WPATH Decl. ¶ 11–14.

The WPATH Declaration further demonstrates how the subpoenas like the State's Subpoena has already discouraged dialogue at WPATH.  *See id*.  For example, WPATH staff has been more cautious about sending written communications out of fear that these communications will be produced and taken out of context in an attempt to misuse and harm the persons WPATH is trying to help.  *Id*.. The Subpoena should be quashed on free association grounds because "there is some probability that disclosure will lead to reprisal or harassment."  *Black Panther Party v. Smith*, 661 F.2d 1243, 1267-68 (D.C. Cir. 1981). WPATH's (and WPATH's members') right to freely associate is a "constitutional right [that] cannot be trumped by fishing expeditions or untenable assertions that the information sought is highly relevant to the litigation."  *In re Heartland Inst*., 2011 WL 1839482, at *5.  That is precisely what the State is attempting to do here.

### D.  Enforcement of the Subpoena Would Impose Undue Burdens on WPATH.

Per Rule 45, "the court for the district where compliance is required must quash or modify a subpoena that … subjects a person to undue burden."  Fed. R. Civ. P. 45(d)(3)(A)(iv). The party issuing the subpoena is responsible for avoiding imposing such a burden.  Fed. R. Civ. P. 45(d)(1).  An undue burden exists when complying with the subpoena would result in time, expense, or collection efforts that outweigh any likely discovery benefit. Fed. R. Civ. P. 26(b)(1).  Additionally, courts have "consistently held that 'non-party status' is a significant factor to be considered in determining whether the burden

12

imposed by a subpoena is undue." *United States v. Amerigroup Illinois, Inc*., 2005 WL 3111972, at \*4 (N.D. Ill. Oct. 21, 2005); *see also U.S. S.E.C. v. Hyatt*, 621 F.3d 687, 694 (7th Cir. 2010) (stating that Rule 45(c) provisions suggest there should be "special attention to the procedural and substantive rights of the nonparty witness."). WPATH is a non-profit organization with a small staff and very few resources. *See* WPATH Decl. ¶¶ 5–6. And, as explained above, the requested discovery has nothing to do with disputed issues in the Underlying Litigation.

## IV. CONCLUSION

For all the foregoing reasons, WPATH's Motion to Quash should be granted.

Dated this 2nd day of December, 2024.

CROWELL & MORING LLP

*By:* /s/ Justin D. Kingsolver
_____

Justin D. Kingsolver
455 N. Cityfront Plaza Drive, #3600
Chicago, IL 60611
jkingsolver@crowell.com

Derick D. Dailey
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
ddailey@crowell.com

*Counsel for WPATH*

DCACTIVE-78427692.4